# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 14-1057V
Filed: March 13, 2015

* * * * * * * * * * * * * * * * * * * * * * * * *
H.S., by his parents and natural
guardians, GREGORY and SANDRA
SIMPSON,

    Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

    Respondent.
* * * * * * * * * * * * * * * * * * * * * * * * *

Finding of Fact; Six Month Requirement;
Special Processing Unit (SPU)

<u>Renee Gentry</u>, Shoemaker, Gentry & Knickelbein, Vienna, VA, for petitioner.
<u>Alexis Babckock</u>, U.S. Department of Justice, Washington, D.C., for respondent.

## ORDER and RULING ON FACTS[1]

**Vowell,** Special Master:

  On October 29, 2014, Gregory and Sandra Simpson ["petitioners"] filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, et seq, [the "Vaccine Act" or "Program"] on behalf of their minor son, H.S. The petition alleges that following the administration of tentanus, diptheria and acellular pertussis ("Tdap") and meningococcal vaccines on July 25, 2012, H.S. experienced syncope and fell to the floor fracturing his skull. Petition at 1. The case was assigned to the Special Processing Unit ["SPU"].

### I. Procedural History

  On November 20, 2014, an initial status conference was held with the staff attorney managing this case. During the status conference, it was noted that the

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002). In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

records filed to that date did not readily identify any physical manifestation of H.S.'s injury lasting at least six months.  *See* Order, February 2, 2015 (ECF No. 20).  Petitioner's counsel confirmed that petitioners were relying on the fact that H.S. was under medical restriction from certain physical activities to meet the Vaccine Act's statutory six month threshold. (*Id*.)  Petitioners subsequently completed the record and filed their statement of completion on January 9, 2015. *See* Statement of Completion (ECF No. 18).

On January 12, 2015, respondent's counsel informally requested a fact determination indicating whether H.S.'s injury persisted for at least six months.  *See* ECF No. 20.  On February 2, 2015, I ordered the parties to file a joint statement indicating what facts are agreed upon and what facts, if any, are in dispute. *Id*.  The parties filed their report on March 12, 2015. *See* Joint Status Report (ECF No. 21).

## II.     Fact History

According to the parties' joint report, the following facts are undisputed (*see* ECF No. 21):

H.S. received his Tdap and meningococcal vaccinations on July 25, 2015. Ex. 4-1, p. 14.  After receiving those vaccinations, he experienced an episode of syncope and hit the back of his head. *Id*., p. 36.  At urgent care, a head CT showed a nondisplaced right occipital skull fracture without bleeding and a neck CT showed a fracture along the right lateral mass of C1 vertebra, extending into vertebral foramen. *Id*., pp. 38-39.  The latter finding was considered questionable. *Id*.

H.S. was referred to Westchester Medical Center for further evaluation and was hospitalized overnight.  *See generally* Ex. 3.  A brain MRI was normal and a C-Spine MRI showed mild disk space desiccation which was thought to be unrelated to his syncope episode. *Id*., pp. 23-24.   Following observation, Dr. Michael Tobias discharged H.S. home with a hard neck collar. *Id*., p. 3.  His injuries were believed to be most likely caused by a reaction to Menactra. *Id*., p. 44.

In a letter dated August 15, 2012, H.S.'s pediatrician, Dr. Richard Fuchs, indicated that H.S. would remain in a neck brace through the middle of September of that year. Ex. 6, p. 23.  Dr. Fuchs further noted that "Following [H.S.]'s confinement to the neck brace, it will still be medically necessary to excuse him from gym, recess and sports for an additional six to eight week period . . .Due to the risk of serious consequences if H.S. were to be reinjured, it will be medically necessary to provide a one-on-one aid for H.S. while he is in school for the initial six-eight weeks after his immobilizing brace is removed." *Id*.

On September 6, 2012, H.S. experienced a second episode of syncope while at school. Ex. 2, pp. 16-18.  He was sent to the hospital, but was discharged after a normal physical examination. *Id*.  At a subsequent well-child visit on October 27, 2012, Dr. Stuart Tashman felt that the September syncope episode was caused by H.S.'s neck

collar being too tight and compromising circulation. Ex. 1, p. 2. Although H.S. had no headaches, weakness, neck pain, and was not taking any medication, Dr. Tashman noted that H.S. "is not allowed to play, gym, ride a bike or play any sports for the following year." *Id*.

H.S. saw Dr. Tobias for a follow-up on April 1, 2013. Ex. 6, p. 5. He was doing well clinically and had recovered from his injury. *Id*. Dr. Tobias cleared H.S. to return to gym class at that time. *Id*. H.S. was later cleared to resume all activities without restriction on September 30, 2013. Ex. 1, p. 12.

### III. Discussion

Under the Vaccine Act, a petition for compensation must contain "supporting documentation, demonstrating that the person who suffered [a vaccine related injury] ... suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa–11(c)(1)(D)(i). The burden of establishing, by a preponderance of the evidence, the persistence of a vaccine-caused injury for longer than six months is borne by petitioners. *Song v. Sec'y of Health & Human Servs.,* 31 Fed. Cl. 61, 65–66, *aff'd*, 41 F.3d 1520 (Fed.Cir.1994).

I have previously noted that "an increased risk of a recurrence without an actual recurrence of a condition is not medically recognized as a 'residual effect' and is not a residual effect within the meaning of § 300aa-11(c)(1)(D)(i) of the Vaccine Act." *Parsley v. Sec'y of Health & Human Servs.*, 08-781V, 2011 WL 2463539, *5 (Fed. Cl. Spec. Mstr., May 27, 2011). In *Parsley*, petitioners' child experienced an intussusception following a rotovirus vaccination that resolved without surgical intervention in fewer than six months. *Id.*, *4. Petitioners argued that, despite the lack of any recurrence of intussusception, their child remained at an increased risk for developing the condition again in the future, and that this risk constituted a "residual effect" of the injury. *Id.*, *5. I disagreed.

More recently, however, a fellow special master has persuasively noted that "because determining the existence, or lack thereof, of clinical symptoms of a disease is the most obvious and logical means of evaluating the duration of the 'residual effects or complications' of that disease, it is understandable that the concepts are often conflated. However, 'residual effects or complications' and 'symptomatic' are not synonymous; one can suffer from a disease without exhibiting any clinical signs thereof." *Faup v. Sec'y of Health & Human Servs.*, 12-87V, 2015 WL 443802, *4 (Fed. Cl. Spec. Mstr., January 23, 2015). In *Faup*, the parties agreed that the petitioner was asymptomatic at least in part because she was being medicated to prevent the recurrence of her symptoms. The special master concluded that the ongoing need for medication to prevent a relapse constituted a "residual effect" of her injury. *Id*.

In the instant case, H.S. remained in a neck collar only for about 12 weeks, or until October of 2012, well shy of the 6 months necessary.  Ex. 1, p. 2; Ex. 7, p. 6.  After that, there is no evidence that he experienced any headaches, pain or outward sign of injury.  Nothing in the medical records, however, indicates that his doctors believed that the removal of the neck brace constituted the resolution of his injury.  Indeed, at the time the collar was removed his doctor indicated based on a CT scan that "the fracture appears to be healing." Ex. 7, p. 6.  As of April 1, 2013, well beyond six months after the implicated vaccination, H.S.'s medical records still indicated that a further CT scan was viewed as necessary to confirm whether the fracture site had fully healed. Ex. 7, p. 8.

Moreover, H.S.'s doctors stressed that he was to remain restricted from activity after his neck collar was removed. Ex. 6, p. 23; Ex. 7, p. 6.  His pediatrician in particular noted that this was "medically necessary" and that the precautions being taken were "due to the risk of serious consequences if H.S. were to be reinjured." Ex. 6, p. 23.  Although H.S.'s restriction from activity was initially only to last 6 to 8 weeks, it was subsequently extended to one year (ex. 1, p. 2) and indeed was not fully and finally lifted until September 30, 2013 (ex. 1, p. 12).  Thus, H.S.'s doctors clearly believed that H.S. remained in a vulnerable state and had not returned to his pre-vaccination condition of health long after he was allowed to remove the neck collar.

These facts indicate that, like the *Faup* case, H.S.'s lack of outward symptoms of his injury are not indicative of the length of time his injury persisted.  Rather, the records make clear that H.S.'s doctors were concerned about the presence of his skull fracture long after he stopped being symptomatic.  That is, like *Faup*, H.S.'s doctors believed that the restriction from activity was medically necessary as part of H.S.'s treatment precisely to ensure that further consequences of his injury would *not* manifest in the future. In that sense, H.S.'s restriction from certain physical activities is precisely analogous to the *Faup* petitioner's ongoing need for medication.

Despite the reference in the records to a "risk" of re-injury, this case is far different from *Parsley*.  In *Parsley*, the petitioners sought to rely on the increase in risk itself as a residual effect of their child's injury.  Here, the medical restriction due to increased risk of re-injury constitutes evidence that H.S.'s doctors did not believe his skull fracture had fully resolved in the first instance.

**Thus, I find based on the record as a whole that petitioners have established that H.S. suffered residual effects of his skull fracture for longer than six months.**

**IT IS SO ORDERED.**

**s/Denise K. Vowell**
Denise K. Vowell
Chief Special Master
